**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GERALD SEARLE and JOY SEARLE,** | : | **CIVIL ACTION NO. 1:10-CV-2432** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CREDIT ADJUSTMENTS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

Before the court are the parties' cross-motions for summary judgment (Docs. 11, 15), wherein plaintiffs Gerald and Joy Searle and defendant Credit Adjustments, Inc. (CAI), respectively seek judgment in their favor on all claims. The complaint alleges that CAI violated several provisions of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692 to 1692p (West 2012), including those prohibiting misleading, harrassing, deceptive, and abusive conduct. For the reasons that follow, the court will deny the Searles' motion in full and grant CAI's motion in part.

**I.   <u>Background</u>**

The facts as set forth herein are undisputed unless otherwise noted, drawn from the parties' statements of facts and responses thereto (Docs. 21, 22, 23, 25), from the exhibits supporting the complaint and the motions (Docs. 1-1 to 1-4, Docs. 12-1 to 12-4, Doc. 14-7), and from the complaint's averments admitted in the answer (Docs. 1, 7). They are recounted only as necessary for disposition of the instant motions.

Gerald and Joy Searle are consumers living in Ohio. (Doc. 21, ¶ 1; Doc. 22, ¶ 1; Doc. 23, ¶ 1; Doc. 25, ¶ 1.) CAI is a debt collector with a business address in Ohio.

(Doc. 21, ¶ 1; Doc. 25, ¶ 1; Doc. 1, ¶ 5; Doc. 7, ¶ 5.) On June 20, 2007, Midwest

Community Health Associates referred an account in Gerald Searle's name in the

amount of $2558.08 to CAI for collection. (Doc. 22, ¶ 1; Doc. 23, ¶ 1.)

CAI maintains that on the same day that Midwest referred Mr. Searle's

account to it, it issued the first of a series of written communications to Mr. Searle

regarding the debt, the amount owed, and CAI's intent to collect upon the debt.

(Doc. 22, ¶¶ 4, 8). The Searles, however, deny ever having received any

communications from CAI until CAI sent them a letter dated September 17, 2010;

the parties agree that such a letter was sent. (Doc. 22, ¶ 11; Doc. 23, ¶ 11; see also

Doc. 1-1, at 2 (reproducing the Sept. 17, 2010 letter).) The letter, addressed to Gerald

Searle, stated that the total balance on all accounts was $3222.48 and informed him

of certain unpleasant consequences that could attend his failure to pay the full

balance within ten days of the letter's date:

> Your account(s) will be referred to our attorney in ten (10) days with
> instructions to seek judgment. If judgment is obtained, we will
> authorize our attorney to proceed with garnishment of your wages
> through your employer, SHILOH CHRISTIAN UNION CHURCH.
> Attachment of real estate and/or personal property may also be
> considered, if necessary, to settle this matter.
>
> Court costs, garnishment fees, attachment fees, and interest allowed
> by the court will be added to your account.
>
> To avoid this action, the sum of $3,222.48 must be paid to this office
> within ten (10) days of the date of this letter.
>
> Attorney Referral Supervisor
>
> This communication is from a debt collector. This is an attempt to
> collect a debt and any information obtained will be used for that
> purpose.

(Doc. 1-1, at 2.) Seven days later, Midwest assigned Mr. Searle's account to CAI for the purposes of collecting the debt on the account. (Doc. 22, ¶ 15, Doc. 23, ¶ 15; <u>see also</u> Doc. 1-4, at 4 (reproducing the written instrument of assignment).)

CAI sent Mr. Searle another letter on October 7, eleven days after the September 17 letter, which stated CAI's intention to take legal action against Mr. Searle if he failed to pay up:

> Due to your negligence to respond to the previous letter sent to you by Credit Adjustments, Inc., we have selected our attorney, Jeffrey R. Lankenau, 0034631, to file a complaint with Fulton County Eastern District Court. This appears to be the only way we will be able to get these accounts paid in full. If the balance of $3,232.57 is not paid within ten (10) days of the date of the letter, we will have to take this action against you.
>
> Court costs, garnishment fees, attachment fees, and interest allowed by the court will be added to your account

(Doc. 22, ¶ 16; Doc. 23, ¶ 16; <u>see also</u> Doc. 1-2 (reproducing the Oct. 7, 2010, letter).)[1]

Mrs. Searle called CAI the following Tuesday, October 12, and spoke with Danielle, one of CAI's employees. (Doc. 22, ¶ 24; Doc. 23, ¶ 24.) CAI provided a transcript of the conversation. (Doc. 12-2) Since the particulars of CAI's conduct, including Danielle's conduct, are at issue in the instant action, portions of the conversation are reproduced here.[2] Early in the call, Danielle identified the sum that CAI had been referred from Midwest:

---

[1] Typographic errors are reproduced here as they appear in the record.

[2] In the transcript, "Q:" precedes Danielle's remarks; "A:" precedes Mrs. Searle's.

> Q. I'm showing that your husband had a balance placed in our office from Midwest Community Health Associates . . . . It's currently $3,236.50.
>
> . . . .
>
> A. Okay. As of today?
>
> Q. As of today right now, yes.
>
> A. Okay.

(Id. 2:24–3:10, Doc. 12-2, at 4–5.) The conversation continued to a brief discussion about an "older judgment" in CAI's system that dated to July 2008:

> Q. There is an older judgment in our system that has not yet been satisfied. That is seventy-nine twenty-one.
>
> A. Okay. And what is that for?
>
> Q. An account from Community Hospital and Wellness Centers. Looking through my system real quick—
>
> A. I need the date on that please.
>
> Q. It's a date of service, July 5th, 2008.
>
> A. And where—what hospital was that?
>
> Q. That's the Bryan Hospital. You were listed as the patient on that.

(Id. 3:11–20, Doc. 12, at 5.) Mrs. Searle promptly returned the topic to the primary charge of over $3000:

> A. . . . [T]he one for Midwest . . . —what exactly is that 3,236 for?
>
> Q. That's something you'd have to go through your records for. Umm, showing a charge-off date of March 13, 2007. Gerald [Searle] is the guarantor on that. . . .
>
> A. Uh-huh.
>
> Q. . . . . That doesn't mean necessarily though that he was the patient on every since date of service.
>
> A. Sure, okay.

4

Q.   A charge-off date basically means it could have been [an] accumulation of dates of services or it could have been just for one date of service.

(Id. 3:25–4:14, Doc. 12, at 5–6.) Seeking then to get an itemized list of the charges involved, Mrs. Searle got sidetracked with Danielle into a tangent about whether CAI uses email to communicate with consumers:

A.   . . . . Well, what we would like to get is an itemized list of—of everything that's owed. . . . [T]his letter that I have in my hand is dated October 7th. We got one previous to that and my husband did respond to it.

Q.   He did?

A.   . . . . [H]e e-mailed someone and told them that, you know, we wanted an itemized list and that we did get it and we fully intend to see what we can pay, you know, what we owe.

Q.   What e-mail did he e-mail to? We don't—

A.   I—

Q.   —do e-mail.

A.   Okay, I don't know but I don't have that paper. I just have the second one in front of me. But—like the same day that we got it, he—umm, sent something.

Q.   Okay. Yeah, that would have been back in September, mid September, when he would have gotten that but, no, we've never received any e-mails. We don't deal with e-mail, Joy.

(Id. 4:15–5:10, Doc. 12, at 6–7.) A moment later, Mrs. Searle refocused the conversation on her wish to receive an itemized list of the charges CAI said that her husband owed, but Danielle explained that she might not be able to oblige:

A.   . . . [W]e just want an itemized list of everything 'cause we—what we did a few years ago was we had some bills with the Community Hospitals in Bryan before and we paid everything off. Everything—

Q.   Okay.

5

A.      —was paid off at that point. And then it seemed like we started getting more bills for the same exact things that we had paid off.

. . . .

Q.      Okay. Well, at this time, with this debt from Midwest Community being as old as it is, this [itemization of charges] would have had to have been requested within 30 days of placement in June of 2007.

A.      Okay.

Q.      This has been in our office, you know, for quite some time now . . . . [T]he only thing that's going to stop the pursuit on this [account] is a payment plan. We don't hold for other purposes. Now if you provide us proof of payment, we can look into it.

A.      Uh-huh.

Q.      But it's been, you know, three years and four months since this was placed.

A.      Okay, well, we have requested, um, itemized lists of bills and we haven't received them and so we're—

Q.      When did you request that?

A.      Oh, it's been like—a couple years ago. . . . [T]hey just seem to be to giving us the run around as far as what these are for.

Q.      Nobody's giving you the run around, Joy.

A.      Umm.

Q.      I've just told you exactly how it is. We are not able to request that any longer because of the date of when that was placed. If you want to send it in writing through the mail, we can see what we can do.

A.      Okay. Send what in writing through the mail?

Q.      Your request.

A.      Okay.

(Id. 5:25–7:20, Doc. 12, at 7–9.) Before the end of the conversation, Danielle

reminded Mrs. Searle that CAI would seek judicial remedies unless a payment plan

were set up:

Q.     So as far as this balance goes though, I cannot stop the pursuit on this case. This is going to proceed to our attorney if it's not set up for payment.

A.     Right. Okay. Well, I will talk with my husband more to see exactly where he sent what he sent, umm, 'cause undoubtedly he didn't make up an e-mail address. He got it off something. And—so he did respond.

. . . .

Q.     Okay.

A.     What—can I refer back to you or do I just call and get whoever when I talk to or—

Q.     If you want to give me a call back, my name's Danielle.

A.     Okay.

Q.     I'll be in my office today until five.

A.     Okay.

Q.     So I'll go ahead and note that we spoke. Now looking at this, this is set to be—reviewed to have sent to our attorney the end of this week. So this will be something we have to to have set up and have payment started on it by the end of this week.

A.     Right. Okay. Okay. I will get back to you then.

Q.     All right.

A.     Thank you.

Q.     Uh-huh, bye-bye.

       (End of recording.)

(Id. 8:5–9:8, Doc. 12, at 10–11.)

Mr. Searle wrote CAI a letter that same day, October 12, 2010, noting that he was writing in response to the letters of September 17 and October 7 (the only two he had received, he wrote), requesting validation of the debt. (Doc. 1-3, at 2.) CAI responded on October 19, sending the Searles an "Account Charge Activity Summary," which itemized the services that the total bill from CAI comprised.

7

(Doc. 22, ¶ 36–37; Doc. 23, ¶¶ 18–42;[3] <u>see also</u> Doc. 12-1, at 15–16 (reproducing the itemized list of charges).)

The record contains no evidence of any communications between the parties or activities conducted by them during the following four weeks.

On November 17, 2010, CAI filed a complaint against Mr. Searle in Fulton County Eastern District Court, Ohio. (Doc. 22, ¶ 38; <u>see also</u> Doc. 1-4 (reproducing the Ohio state-court complaint).) The complaint sought judgment in the amount of $2,558.08—the total amount shown in the itemized list of charges sent that CAI sent to the Searles—plus interest from March 13, 2007.[4] (Doc. 1-4, at 2.) According to an unofficial docket sheet for the case, CAI obtained a default judgment against Mr. Searle on March 1, 2011, which awarded CAI the $2,558.08 it sought, 4% interest on that sum accruing from March 13, 2007, and costs. (Doc. 12-3, at 2.)

Meanwhile, the Searles initiated the instant action with the filing of their complaint (Doc. 1) on November 24, 2010, one week after CAI filed suit against Mr. Searle in Ohio state court. CAI answered on January 20, 2011 (Doc. 7), and after completion of discovery, both parties filed motions for summary judgment. CAI filed their motion and brief in support (Docs. 11, 12) on June 15, 2011—timely filed according to the case management order (<u>see</u> Doc. 10)—but the Searles neglected to

---

[3] Doc. 23 contain's plaintiffs' blanket admission of all of defendant's factual allegations in Doc. 22, ¶¶ 18–42.

[4] The date March 13, 2007, coincides with a "charge-off date" for the account that Danielle referred to in her conversation with Mrs. Searle on October 12, 2010. (Doc. 12-2, at 6.)

file their cross-motion (Doc. 15) until July 6, 2011, fully three weeks past the

deadline, and without leave from the court to file belatedly.[5] In any event, both

motions are now fully briefed and ripe for disposition.[6]

## II.   Standard of Review for Cross-Motions for Summary Judgment

Through summary adjudication, the court may dispose of those claims that

do not present a "genuine dispute as to any material fact" and as to which a party is

entitled to judgment as a matter of law. See FED. R. CIV. P. 56(a). The burden of

proof is upon the nonmoving party to come forth with "affirmative evidence,

beyond the allegations of the pleadings," in support of its right to relief. Pappas v.

City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see

also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be

---

[5]  The court notes that there are several grounds for striking or refusing to accept a dispositive motion filed after the deadline. Most directly applicable is this court's order of January 27, 2011, which twice stated that dispositive motions *and* supporting briefs were required to be filed by June 15, 2011, and that failure to timely file both the motion and the supporting brief would result in this court's refusal to accept to motion. (Doc. 10, at 3 pt. 6(a).) In the background of this court's specific mandate lies Local Rule 83.3.3.1(a), which provides that the failure of counsel to comply with any order of court may result, *inter alia*, in counsel being precluded from raising certain issues or judgment being entered, in whole or in part, against the defaulting party. Further, CAI's brief in opposition specifically references the Searles' untimely filing of their motion and suggests that the motion should be stricken. (Doc. 18, at 1, pt. II.A.) Nonetheless, in the spirit of the Federal Rules of Civil Procedure, which were designed and promulgated on the precept that disposition of a case on its merits is preferable to a technical disposition, and for reasons explicated in Part III supra—namely, the Searles' failure to show their entitlement to judgment as a matter of law on any issue at this stage of litigation —the court will entertain the Searles' motion and address its contents.

[6]  Departing from conventional practice, the Searles filed the same brief (twice) as both opposition to CAI's motion and support for their own motion. (Docs. 14, 16.)

adequate, as a matter of law, to sustain a judgment in favor of the non-moving party

on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see

also FED. R. CIV. P. 56(a), (e). Only if this threshold is met may the cause of action

proceed. Pappas, 331 F. Supp. 2d at 315.

In the instant matter, the parties have filed cross-motions for summary

judgment. According to the Third Circuit:

> Cross-motions are no more than a claim by each side that it alone is
> entitled to summary judgment, and the making of such inherently
> contradictory claims does not constitute an agreement that if one is
> rejected the other is necessarily justified or that the losing party waives
> judicial consideration and determination whether genuine issues of
> material fact exist.

Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008) (quoting Rains v. Cascade

Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)). Each movant must show that no

genuine issue of material fact exists; if both parties fail to carry their respective

burdens, the court must deny the motions. See Facenda v. N.F.L. Films, Inc., 542

F.3d 1007, 1023 (3d Cir. 2008). When reviewing each motion, the court is bound to

view the evidence in the light most favorable to the nonmovant. FED. R. CIV. P. 56;

United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa. 1980).

III.   **Discussion**[7]

Enacted in 1977, the Fair Debt Collection Practices Act, as its name implies,

was passed into law with the intention of curbing the "abundant . . . abusive,

deceptive, and unfair debt collection practices" that debt collectors commonly

employed. 15 U.S.C. § 1692(a). The purpose of the FDCPA is explicitly to eliminate

those abusive debt-collection practices and encourage states and local governments

to take consistent measures to protect their residents against debt-collection

abuses. Id. § 1692(e). In apparent recognition of many debt collectors' creativity in

developing methods of encouraging debtors to pay up, many of the Act's provisions

are cast in broad terms, and its subdivisions contain long, open-ended lists of

examples of conduct that violate the Act.

In their complaint, the Searles allege violations of §§ 1692d, e, and f generally,

with specific mention of subsections e(4), e(5) e(10), f(5), and f(10). (Doc. 1, ¶ 38.)

Their single brief submitted in connection with the instant motions discusses only

§§ 1692e and f(1) (Doc. 14, at 5) and makes passing reference to §§ 1692d, e, and f

(Doc. 14, at 8)—thus complicating the task of ascertaining on what grounds and

claims the Searles argue for summary judgment. CAI, for its part, devotes most of

its briefing to what amount to affirmative defenses based on their alleged

---

[7] Since the operative facts of this case all took place in or affected parties living in Ohio, and all parties agree that Ohio law applies to any portion of the dispute controlled by state law, the court will accordingly treat Ohio's statutes and Supreme Court cases as binding authority where the parties' claims or defenses implicate questions of state law.

compliance with the notice and debt-verification requirements of § 1692g and with

applicable portions of Ohio state law. (Doc. 12, at 8–11.) CAI otherwise makes

specific arguments only as to FDCPA §§ 1692e(4), f(5), f(6), and f(1). (Doc. 12, at

11–13; Doc. 18, at 2. These discrepancies and variations make the usual seriatim

approach to the issues perhaps more troublesome than helpful; the following

discussion instead proceeds by addressing, in groups, classes of arguments or

related concepts whenever such grouping is possible. First, though, a brief overview

of the relevant FDCPA provisions will provide some useful background for the

ensuing analysis.

### A.      **Relevant FDCPA provisions**

The instant motions pose questions arising under four major sections of the

FDCPA and at least eight subsections:

- **Section 1692d** prohibits a debt collector from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with a debt." 15 U.S.C. § 1692d. The subsections list several examples but are explicitly not intend to "limit[] the general application of the foregoing." Id.

- **Section 1692e**, meant to be as broadly construed as § 1692d, prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation [*sic*] or means in connection with the collection of any debt." The subsections again list specific examples of conduct that would violate § 1692e, but do not limit the reach of § 1692e to those specific kinds of conduct.

    - **Section 1692e(4)** prohibits "[t]he representation or implication of any debt will result in . . . the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action."

- **Section 1692e(5)** prohibits "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken."

- **Section 1692e(10)** prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

- **Section 1692f**, also deliberately broad in its wording and scope, prohibits debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt."

  - **Section 1692f(1)** prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

  - **Section 1692f(5)** prohibits "[c]ausing charges to be made to any person for communications by concealment of the true purpose of the communication."

  - **Section 1692f(6)** prohibits, under certain conditions, "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property."

- **Section 1692g**, entitled "Validation of debt," sets forth certain procedures that a debt collector must follow before making any attempt actually to collect on the debt.

  - **Section 1692g(a)**, the most important subsection of § 1692 in the matters now before the court, defines the notice, and the timing of the notice, that a debt collector must provide to the consumer. According to § 1692(g)(a), within five days of a debt collector's initial communication with a consumer, a debt collector must send the consumer a written notice containing, *inter alia*:

    - The amount of the debt, id. § 1692g(a)(1);

    - The name of the creditor to whom the debt is owed, id. § 1692g(a)(2); and

    - A "statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector," id. § 1692g(a)(3).

Because many of CAI's arguments for summary judgment in its favor are

predicated on compliance with § 1692g(a)—compliance that CAI has failed thus far

to establish—the analysis turns directly to the group of questions that such

noncompliance poses.

**B.**     **CAI's failure to establish its compliance with the notice provisions of § 1692g(a)**

CAI insists that it first sent correspondence to Mr. Searle on June 20, 2007,

the same day that Midwest referred the Searle account to CAI. (Doc. 22, ¶ 4; Doc. 12,

at 2.) This correspondence allegedly included the required notice under § 1692g(a),

including the statement that unless the consumer disputes the validity of the debt

within thirty days of receipt of the notice, the debt collector may assume that the

debt is valid. (Doc. 12, at 2.) CAI maintains that it sent "additional correspondence"

to Mr. Searle on three other occasions in 2007, but received responses from Mr.

Searle to none of them. (Id.)

In support of these asseverations, CAI has submitted an affidavit by Gary

Foreman, CAI's Operations Manager, along with several attachments. (Doc. 12-1.)

Foreman's affidavit echoes what CAI says elsewhere about the company's putative

2007 letters sent to Mr. Searle. (Id. ¶¶ 6, 8.) Although Foreman alleges having

personal knowledge of the Searle account (id. ¶ 1), he qualifies his statements about

CAI's 2007 letters by saying that the letters were sent "[a]ccording to CAI's account

records" (id. ¶¶ 6, 8). In fact, he admits that CAI does not have a copy of any of the

four letters that the company claims to have sent to Mr. Searle in 2007. (Id.) The

"letters" attached to the affidavit (id. at 11–15) were "true and accurate samples,"

assured Foreman, but such "samples" establish no facts relevant to CAI's defense.

14

As to CAI's records that it kept for Mr. Searle's account, which are also attached to Foreman's affidavit, such records are inscrutable to one unfamiliar with CAI's coding system. For instance, among the entries in the account records dated June 20, 2007, four bear a timestamp of 16:29:33, are listed as type "S" entries, and indicate that user "sys" made these entries. (Id. at 4.) In the order they appear in the records, the "notes" section of the four entries read:

> Action ARREQPL95: Letter 001 successfully requested
>
> Letter 001 Validation Notice - Standard. requested for JERRY B SEARLE (POR)
>
> Action ARCHGSTAT: Status changed from LTRNEWBIZ to LTRPL95REQ.
>
> Status changed from LTRNEWBIZ to LTRPL95REQ

(Id.) One might hazard a guess that these notes mean that, shortly before the close of business on June 20, 2007, CAI sent a letter to Mr. Searle that contained the notice required in 15 U.S.C. § 1692g(a), but a guess is all that would be. Further, making such a guess and then, on that basis, considering it an established undisputed fact that the letter was indeed sent on June 20, 2007, would require (a) resolving all doubts as to the existence of a dispute over a material fact—here, the sending of the letter on June 20—in CAI's favor, and (b) making all reasonable inferences and interpretations of the evidence in the way most favorable to CAI, which is precisely the opposite of what the applicable standard of review requires.

Moreover, portions of the transcript of the telephone conversation between CAI's employee Danielle and Mrs. Searle undercut CAI's claim that it sent Mr.

Searle any written communications before September 17, 2010. At one point in that conversation, Mrs. Searle said, "[T]his letter that I have in my hand is dated October 7th[, 2010]. We got one previous to that and my husband did respond to it." (Doc. 12-2, at 6, lines 16–19.) A moment later, still in the same conversational thread, Mrs. Searle said, "I just have the second [letter] in front of me. But—like the same day that we got it, he—umm, sent something." (Id. at 7, lines 5–6.) Danielle responded: "Okay. Yeah, that would have been back in September, mid September, when he would have gotten that . . . ." (Id., lines 7–8.) One plausible interpretation of this dialogue—and an appropriate one to make, in reviewing CAI's motion for summary judgment—is that Danielle was agreeing with Mrs. Searle's statement that the first letter that CAI ever sent to Mr. Searle was in September 2010, not June 2007.

CAI's failure to establish that it sent any written communication to Mr. Searle in 2007 dooms its contention that it complied with FDCPA § 1692g(a). This failure knocks down, like a chain of dominoes, every other argument that relied on CAI's ostensible compliance with § 1692g(a): lacking such compliance, CAI was not entitled to presume that Mr. Searle's debt was valid, which casts the letters that CAI sent to Mr. Searle beginning in September 2010 in a very different light.

The September 17, 2010 letter told Mr. Searle that he owed $3,222.48 to an unnamed creditor and that he had ten days to pay this amount in full to CAI, lest his "account(s) be referred to [CAI]'s attorney . . . with instructions to seek judgment." (Doc. 1-1, at 2.) The letter threatened Mr. Searle with garnishment of his

wages and with the prospect of "[a]ttachment of real estate and/or personal property" if CAI deemed it "necessary" to "settle [the] matter." (Id.)

Assuming for the purposes of deciding CAI's motion that the September 17, 2010, letter was the first time Mr. Searle had heard from CAI, CAI has no entitlement to summary judgment on a claim under § 1692d, as such a letter smacks of the harassing, oppressive, and abusive conduct that § 1692d was intended to prevent. Similarly, CAI cannot prevail on its motion as to § 1692e or any of the subsections under which the Searles claim (i.e., subsections (4), (5), and (10)); the representations in the September 17 letter are easily characterized as "false, deceptive, or misleading." Without having given the notice required by § 1692g, the representation of the amount of the debt was false;[8] the implication that CAI had the lawful right to seek judgment against Mr. Searle for over $3,000 was false; and the implication that CAI had the right to demand such a sum from Mr. Searle lest his wages be garnished or property seized was also false. By the same token, CAI cannot defeat either the Searles' general § 1692f claim or their § 1692f(1) claim.[9]

---

[8] CAI points to Ohio Rev. Cod. Ann. § 1343.03(A), which controls the rate of interest that may be charged on money that "becomes due and payable upon any bond, bill, note, or other instrument of writing," as authority that establishes CAI's addition of interest to Mr. Searle's account as lawful. However, in the absence of a finding of CAI's compliance with FDCPA § 1692g(a), there is a factual dispute as to whether Mr. Searle was afforded his right to a thirty-day period in which to dispute the debt; hence, the debt was never validated and never became "due and payable," precluding CAI from relying on Ohio's statute in this fashion.

[9] The Searles' complaint mentioned only § 1692f as a whole without naming any of its subsections, but their brief on the motions (Doc. 14) argued that CAI had violated § 1692f(1). CAI objected to the § 1692f(1) argument, calling it a "new claim"

When the September 17 letter is viewed as the first communication from CAI to Mr.

Searle, the threat of "pay up now or face garnishment of your wages and the loss of

your house" meets any common-sense definition of "unfair or unconscionable."

Given that the standard of review applicable to CAI's summary-judgment

motion require that the September 17, 2010 letter to Mr. Searle be viewed as the

company's first written communication to him—a communication that

unquestionably fails to satisfy FDCPA § 1692g(a) and was made on the

unestablished predicate that Mr. Searle's debt could be assumed valid—CAI's

motion for summary judgment must be denied on the Searles' claims under 15

U.S.C. §§ 1692d, 1692e, 1692e(4), (5), and (10), 1692f, and 1692f(1).

**C.** **The Searles' failure to establish any dispute of material fact that would preclude summary judgment against them on their § 1692f(5) and (6) claims**

CAI's brief in support of its motion contains sparse but cogent arguments

against the Searles' § 1692f(5) and (6) claims. First, as noted above, § 1692f(5) forbids

---

that the court must "ignore" because "new claims may not be added in response to a defendant's motion for summary judgment." (Doc. 18, at 2.) However, this caviling fails to appreciate not only that subsection (1) of § 1692f is merely an example of a universe of ways of violating the prohibition against collecting debts using "unfair or unconscionable means," but also that under the Federal Rules' pleading standards, a complaint's mention of the explicitly broad § 1692f puts a defendant on fair notice that it may need to defend against allegations of the conduct described in any of § 1692f's subsections. Moreover, the complaint details conduct that could be considered to violate § 1692f(1). See, e.g., Doc. 1, ¶ 14 (alleging that the October 7, 2010, letter stated a higher balance due with no explanation for the increase); id. ¶¶ 23, 25 (alleging that the amount due on the summary that the Searles received from CAI was reported to be $2558.08, with a $678 discrepancy between that sum and what CAI had previously indicated was owed). See also n.8 supra.

debt collectors from "[c]ausing charges to be made to any person *for communications*." Id. (emphasis added). A review of the evidence of record reveals nothing to suggest that CAI imposed any such charges on either Mr. or Mrs. Searle.[10] Summary judgment is therefore appropriate for CAI on this claim.

CAI makes a similar argument, and the Searles a similar lack of evidentiary showing, in connection with the claim under § 1692f(6), which forbids debt collectors from "[t]aking or threatening to take any *nonjudicial* action to effect dispossession or disablement of property." Id. (emphasis added). The evidence of all actions that CAI took or threatened to take "to effect dispossession or disablement" of the Searles' property were strictly judicial in nature. (See Doc. 1-1, at 2 (CAI's letter of Sept. 10, 2010, threatening to refer Mr. Searle's account to CAI's attorney "with instructions to seek judgment"; Doc. 1-2, at 2 (CAI's letter of Oct. 7, 2010, informing Mr. Searle that CAI's attorney would be filing a complaint in Ohio state court against him); Doc. 1-3, at 2–6 (reproducing the complaint and attachments

---

[10]   The court is constrained to note that the Searles' statement of facts (Doc. 21) in support of their motion and counterstatement of facts (Doc. 23) in opposition to CAI's motion both lack any citations to record evidence. Omitting any citations from a statements of facts not only defeats its purpose, such a statement being of no use to the court in determining what the record does and does not establish as undisputed, but also fails to comply with applicable federal and local rules. See Fed. R. Civ. P. 56(c)(1)(A) (imposing a general requirement that a party asserting that a fact is or is not disputed support such a statement by "citing to particular parts of materials in the record"); L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.").

that CAI filed against Mr. Searle in Ohio). Summary judgment is therefore appropriate for CAI on the § 1692f(6) claim as well.

### D. The Searles' failure to establish as undisputed that the September 17, 2010 letter was the first communication they received from CAI precludes summary judgment in their favor on all claims

As discussed in Part III.B <u>supra</u>, CAI failed to establish that, for the purposes of its motion, it had made written communications to Mr. Searle in 2007. Largely on the basis of those same reasons—and reviewing the evidence in a light most favorable to CAI—the Searles have failed to establish that CAI *did not* send them letters on June 20, August 10, September 24, or November 8, 2007, and thus failed to establish that the September 17, 2010 letter was the first written communication from CAI.

Evidence to support such a claim is scant: all that exists in the record to support the Searles' contention on this crucial issue of fact is the excerpt from the dialogue between Danielle and Mrs. Searle on October 12, 2010, also discussed in Part III.B <u>supra</u>. In that conversation, Danielle makes a statement that could be taken as a confirmation of Mrs. Searle's contention that CAI had sent Mr. Searle nothing before September 2010. (<u>See</u> Doc. 12-2, at 6, lines 15–19; <u>id.</u> at 7, lines 7–10.)

Yet in that same conversation, Mrs. Searle makes a passing reference to what could have been the 2007 written communications from CAI:

A. —I guess we just want an itemized list of everything 'cause we—what we did a few years ago was we had some bills with the Community Hospitals in Bryan before and we paid everything off. Everything—

Q.   Okay.

A.   —was paid off at that point. *And then it seemed like we started getting more bills for the same exact things that we had paid off.*

(Id. at 7, line 25, to 8, line 7 (emphasis added).) A moment later in the same conversation, Mrs. Searle said that she requested "itemized lists of bills" (though from whom, she did not say) "a couple years ago." (Id. at 9, lines 5–9.) These portions of the conversation, viewed in a light most favorable to CAI, tend to undermine the Searles' claim that the September 2010 letter was the first that they received from CAI. Foreman's affidavit (Doc. 12-1) and CAI's records of Mr. Searle's account (Id. at 4–10) further undermine the Searles' claim.

Much as the success or failure of CAI's motion for summary judgment turned largely on whether it had established compliance with § 1692g(a), the success of the Searles' motion depends on establishing that the September 17, 2010, letter was CAI's first communication. Stated differently, to succeed in the context of Rule 56, the Searles must refute CAI's contention and circumstantial evidence that they were sent letters in 2007 that gave them notice under § 1692g(a). If they received those letters but failed to respond to them, CAI was entitled to presume the debt was valid per § 1692g(a)(3)—with the consequence that all actions that CAI took in 2010 and 2011, by writing, by telephone, and in court, could not be said to have violated any provision of the FDCPA, at least not for the purposes of adjudicating the instant motions.

By way of further explanation, if CAI did send a § 1692g(a)-compliant letter to

Mr. Searle in June 2007 but he failed to dispute the debt in the 30-day period

allowed, CAI was entitled to treat the debt as valid, start charging interest as

allowed under Ohio law, and seek the judicial remedies that it described in its

letters of September and October 2010. The Searles' motion for summary judgment

must therefore be denied on all counts.[11]

## IV.    Conclusion

For the foregoing reasons, the court will DENY both motions for summary

judgment (Docs. 11, 15), with the exception that CAI's motion (Doc. 11) will be

granted with respect to the Searles' claims under 15 U.S.C. §§ 1692f(5) and (6). An

appropriate order will issue.

  S/ Christopher C. Conner  
CHRISTOPHER C. CONNER
United States District Judge

Dated:      March 30, 2012

---

[11]   The Searles devote a little over a page of their brief (Doc. 14, at 5–6) to an argument that certain portions of the Danielle–Mrs. Searle conversation contained "misleading" statements by Danielle. This argument has no support in the record. First, Danielle's reference to a "judgment" is supported by a $75 default judgment which is reflected in the record. (Doc. 17-1.) Second, Danielle's statement that CAI doesn't "do email" is neither refuted nor demonstrated to be misleading by the Searles' screen shot of a portion of CAI's website (Doc. 14-7, at 2–3), which invites consumers with CAI account numbers to contact the company by filling out an online form. Significantly, the same screen shot notes that CAI is "unable to reply via email" to form submissions but that the company would respond "by letter or phone." (Id. at 2.)

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GERALD SEARLE and JOY SEARLE,** | : | **CIVIL ACTION NO. 1:10-CV-2432** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CREDIT ADJUSTMENTS, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

AND NOW, this 30th day of March, 2012, upon consideration of the cross-motions for summary judgment filed by plaintiffs (Doc. 15) and defendant (Doc. 11), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion for summary judgment (Doc. 15) filed by Gerald Searle and Joy Searle is DENIED in full.

2. The motion for summary judgment (Doc. 11) filed by Credit Adjustments, Inc., is GRANTED as to plaintiffs' claims under 15 U.S.C. §§ 1692f(5) and (6), and DENIED in all other respects.

3. A scheduling order shall issue by further order of the court.

                                     S/ Christopher C. Conner

                                    CHRISTOPHER C. CONNER
                                    United States District Judge